JAE K. PARK (Bar No. 234474)
jae.park@dentons.com
DENTONS US LLP
601 S Figueroa St
Suite 2500
Los Angeles, CA 90017
Tel: (213) 623-9300
Fax: (213) 623-9924

WILLIAM T. O'BRIEN (*pro hac vice* to be filed)
william.obrien@dentons.com
JOHN W. LOMAS, JR. (*pro hac vice* to be filed)
john.lomas@dentons.com
1900 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 496-7500
Facsimile: (202) 496-7756

Attorneys for Plaintiff Pavel Fuks

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| Pavel Fuks,<br><br>               Plaintiff,<br><br>vs.<br><br>Yuri Vanetik,<br><br><br>               Defendant. | **COMPLAINT:**<br><br>1. **PROMISSORY FRAUD**<br>2. **INTENTIONAL MISREPRESENTATION**<br>3. **BREACH OF CONTRACT**<br>4. **CONVERSION**<br>5. **UNJUST ENRICHMENT**<br>6. **VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONAL CODE**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.      This is an action for fraud, intentional misrepresentation, breach of contract, and unjust enrichment.  Defendant Yuri Vanetik defrauded Plaintiff Pavel Fuks out of $200,000 by promising that he could obtain for Fuks a VIP package for

the 2017 US presidential inauguration that included prime seating, tickets to exclusive inaugural balls, and access to other special events.  But there was no VIP package, no prime seating, no tickets to exclusive balls, and no access to special events.  It was all a scam.  When Fuks requested a refund, Vanetik blamed a purported intermediary—"Meadowood PR"—with whom Vanetik claimed he had contracted to provide the VIP inauguration package.  But Vanetik refused to produce a copy of the contract or contact information for Meadowood.  It turns out Meadowood PR is just part of Vanetik's scam.  There is no actual Meadowood PR. It's just a fake front Vanetik uses for his own means, including for suspect filings with the U.S. Department of Justice under the Foreign Agents Registration Act.

2.      This isn't the first time that Vanetik has engaged in fraud.  A California Court of Appeals recently found that "substantial evidence" supported a jury's verdict that Vanetik had defrauded a friend out of $750,000.  In that case, the trial judge described Vanetik and his father as "artful puppeteers who masterminded the scam that relieved the plaintiff of $750,000," and further found that the "money was used to personally enrich [Vanetik and his father] and enable them to travel the world trolling for more big fish."

3.      Unfortunately for Fuks, he got caught on Vanetik's line.  Fuks gave Vanetik every opportunity to return the money, but Vanetik refused, and instead warned Fuks that Vanetik's friends and colleagues in Washington, DC would send authorities after him.  Not long after, Fuks had his visa revoked and a five-year travel ban instituted against him.

## PARTIES

### Plaintiff

4.      Plaintiff Pavel Fuks is a Ukrainian businessman, investor, and philanthropist focusing on real estate, economic development, and Ukraine's energy security.

COMPLAINT

5.      Fuks serves as a founding member of the Supervisory Board of the Babi Yar Holocaust Memorial Center, a nonprofit educational institution that documents and commemorates the Holocaust, in particular the Babi Yar mass shootings of September 1941.  Among Fuks' fellow Supervisory Board members are human rights activist Natan Sharansky, former United States Senator Joseph Lieberman, former President of Poland Alexander Kwasniewski, former Director-General of UNESCO Irina Bokova, former Minister of Foreign Affairs of Germany Joschka Fischer, the chief rabbi of Kiev and Ukraine Yakov Dov Bleich, world heavyweight champion Volodymyr Klitschko, and musician and civic activist Svyatoslav Vakarchuk.

6.      Fuks is active in philanthropic and social welfare endeavors in Ukraine. He supported the restoration of the historic Kharkiv Regional Philharmonic and is a Member of the Board of Trustees of the City Without Barriers Foundation, a nonprofit organization committed to creating a comfortable environment for people with physical and mental disabilities.

7.      In 2014, he was named an Honorary Citizen of Kharkiv, Ukraine's second largest city and Fuks's home town, by the Kharkiv City Council.

**Defendant**

8.      Defendant Yuri Vanetik is a resident of Orange County, California.

9.      In a registration statement that Vanetik filed with the United States Department of Justice pursuant to the Foreign Agents Registration Act, Vanetik stated that he is a Management Consultant and Private Investor.

10.     Vanetik has been referred to as a "master of selfies" as he regularly posts pictures of himself with politicians on social media in an attempt to have others believe he has political influence.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) as Plaintiff Fuks is a citizen of a foreign state and Defendant Vanetik is a citizen of

COMPLAINT

1  California, and the amount in controversy exceeds $75,000.

2      12.     This Court has personal jurisdiction over Defendant as he is a citizen

3  and resident of California.

4      13.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) as

5  Defendant is a resident of this District.  Venue is also proper in this District under

6  28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving

7  rise to the claim occurred in this District.  For example, as part of Vanetik's

8  fraudulent scheme, he requested that Fuks wire funds to a bank account for a

9  purported company in Los Angeles.

10                          **BACKGROUND**

11     14.     Fuks met Vanetik in the spring of 2016. Vanetik was seeking to be

12  retained by the city of Kharkiv to promote its interests in the United States, and

13  claimed to be well connected politically in the United States.

14     15.     In the fall of 2016, Vanetik claimed to Fuks that he could secure for

15  Fuks VIP treatment at the U.S. presidential inauguration in 2017.

16     16.     In a November 16, 2016 message to Mr. Fuks, Vanetik asserted:

17  "There are guests that get tickets and guests that get VIP treatment. Regular

18  attendance is a joke."

19     17.     The next day, Vanetik messaged Fuks and said "Time to get tickets is

20  next 5 days. Then, they go up. Next year they will be at least 3 times the price - at

21  best."

22     18.     Fuks asked Vanetik how much the tickets would cost.

23     19.     Vanetik responded on November 18, 2016, and said "Best VIP 100k

24  per person. 3 days includes top briefings tickets to inaugural ball, etc. photo opps

25  most likely. There are levels below that as well."  Vanetik further noted that "Hotels

26  should be booked now and payments handled as soon as possible."

27     20.     Fuks said that he would take two tickets and asked what documents

28  would be needed.

COMPLAINT

21.     On November 18, 2016, Vanetik responded to Fuks: "Passports email to me. Will send you wire information later today."

22.     A few hours later, Vanetik initially instructed Fuks to wire payment to a Citibank account for the "Hamilton Law Offices Client Trust Account."  The address Vanetik gave for the account beneficiary is 5757 W Century Blvd. Suite 700, Los Angeles, CA 90045.

23.     Vanetik also instructed Fuks to note that the wire was for "legal services."

24.     But Vanetik then sent a copy of a purported contract and invoice from Odyssey Management LLC, and asked Fuks to pay in accordance with that invoice instead.

25.     Relying on Vanetik's promises to deliver on the VIP inauguration packages, Fuks wired US$200,000 to Odyssey Management LLC in California as instructed by Vanetik.

26.     Unbeknownst to Fuks at the time, Odyssey Management LLC appears to be a fake company.  The invoice from Odyssey Management LLC states Odyssey Management LLC's address is 1401 Dove Street, 260, Newport Beach, CA.  There is no such entity registered in California, and appears to be no record of an Odyssey Management LLC at that address.

27.     On November 24, 2016, Fuks asked Vanetik when he would send the program of events for the package he had purchased.

28.     Vanetik responded within minutes and stated "Should have some type of schedule next week. We are all waiting for details."  Vanetik also indicated that he would be at the inauguration on January 20th.

29.     Fuks thanked Vanetik and Vanetik responded:  "My pleasure, Pavel."

30.     A few days later, on November 29, 2016, Vanetik messaged Fuks and said: "Hi Pavel. Everything is done. I now have what seems to be the final layout. There are a few 'nuances' to go over. Let's chat a little later."

COMPLAINT

31.   On November 30, 2016, Vanetik sent Fuks the following details regarding the package Fuks had purchased:

Cabinet Dinner – 2 tickets

Victory Reception – 4 tickets

Inaugural Concert and Fireworks – 4 tickets

Parade – 4 VIP Tickets

Inaugural Ball Premier Access – 2 tickets

Presidential Swearing-In Ceremony – 2 tickets

Vanetik stated that "This is the VIP package that we bought. There are corp VIP packages as well. I will review everything tonight and will connect with you tomorrow am or this evening (your am)."

32.   Fuks asked for confirmation that the events Vanetik had listed were in fact what Fuks had purchased with the VIP package.  Vanetik responded: "Yes. And a few extras."

33.   Fuks asked about the extras, and also stated that he had been told he had bad seats.

34.   Vanetik asked who told Fuks that, and said it made no sense.  He also then told Fuks that he was getting a $250,000 package for the discounted price of $200,000.

35.   Vanetik than told Fuks the extras he would receive included certain congressional events and placement during events.

36.   Vanetik then stated:  "You obviously get more with more money - but I think a million may be wasteful. If your goal is to have a nice time and get good pics this is the range."

37.   On January 9, 2017, Vanetik messaged Fuks about the payment Mr. Fuks had made for the inauguration package, stating:  "Pavel - next several days need to have BEM Global sign a note for funds transferred. Otherwise, you will need to send 80k to covet [sic] taxes. This is a priority. This saves you 80k and 50k

from the package you are getting."

38.    Vanetik also messaged Fuks to recommend additional events, such as a breakfast with 10 to 12 senators for $20,000 per person, an unidentified event with Congressman Ed Royce for $20,000 per person, and exclusive events hosted by the Republican Party of New York for at least $35,000 per person.

39.    Vanetik then told Fuks that to have a better chance of meeting up with the president-elect, Fuks would need to pay an additional $350,000, but that the cost "may be a bit more or less depending on who it is negotiated."  Vanetik further stated: "You need to be prepared to spend money to get access at events like this. Otherwise, to just have a fun time, you are all set."

40.    At the last minute, Vanetik told Fuks that there were numerous changes to the program and huge amounts of money coming in for the events. Vanetik did not explain.

41.    On January 15, 2017, Vanetik messaged Fuks and said "Hi pavel. I should have final schedule sent to me today. Will forward it to you. I will be leaving for DC tomorrow."

42.    Two days later, when Vanetik still hadn't sent the schedule, Fuks asked where it was.  Vanetik responded: "Hey Pavel. I just arrived to DC. I am waiting for a revised one. There is a problem with dinner. Trying to fix it... should have it in am. What time are you flying in?"

43.    After finding out when Fuks was arriving in Washington, DC, Vanetik said "I will send you schedule in about an hour or so. We got f***ed on the dinner. I am working on fixing it. I hate this Inauguration. It is nothing but headaches. It would be better if you came tomorrow or today."

44.    For the morning of the inauguration, Vanetik had promised to have Fuks picked up and taken to the inauguration in Congressman Dana Rohrabacher's car.   The car never came.

45.    So Fuks and his party started out walking in the rain to try to see the

COMPLAINT

inauguration.  But the streets were very crowded, and when they finally approached an access point, they were not allowed to come through because they did not have passes.  So Fuks and his party ended up returning to their hotel where they watched the inauguration ceremony on television at the hotel bar.

46.     Later that day, Fuks sent Vanetik a picture of friends who had attended balls that Fuks had understood would be part of the VIP treatment, and said: "These are my friends, they attended a real ball yesterday and we did some f**king s**t for suckers."

47.     Vanetik blamed Fuks:  "You missed several big events."

48.     Fuks asked Vanetik to let him know when would be a convenient time to discuss a refund.  Vanetik promised he would return the funds within a week or two.  He never did.

49.     Fuks continued to message Vanetik asking him whether he had refunded Fuks's money.  Vanetik pinned the blame on others and said he needed a little more time.

50.     Fuks asked Vanetik to let him know who Vanetik had dealt with, and that Fuks would contact them himself.

51.     On March 8, 2017, Fuks again requested an update from Vanetik.

52.     Vanetik responded the next day stating:  "Hi Pavel. Hope you are well. I had forwarded a letter from (I assume your in house lawyer) to the principals. They should be responding shortly. The company that invoiced your firm is subject to an NDA, which prevents us from disclosing the actual agreements with third parties. The position of the PR firm (Meadowood PR) is that it fulfilled its obligations to me (and you).  In turn, I had forwarded to you a modified schedule, which you did not object to. I was also told much has changed and the meetings had started on 16th. I had shared this with you. I understand that you felt let down, and I was also very uncomfortable.  Notwithstanding any of this, I believe that I could negotiate a preemptive settlement where you may get sufficient value for your money, and

COMPLAINT

avoid further aggravation. This would be my recommendation. Of course, what you do is up to you. I had briefly explained this to Dima, the person that was involved in the process of wiring funds.  Lets wait to see their response to your letter, and let me know how you want proceed. Other than negotiating another public relations type deal, I don't know how much I will be able to do."

53.     The purported public relations firm referenced by Vanetik appears to be a fake company that Vanetik himself created.  There is a website for a Medowood Public Relations.  The site has all the hallmarks of a fake, front website.  Much of the text in the About Us section was lifted from the website of Sierra Nevada Chapter of the Public Relations Society of America.  Other text was lifted from other public relations firm websites.  Each of the "Services We Offer" links on the site goes to a blank page.

54.     The address listed for Medowood PR on its website is 8200 Wilshire Blvd., Suite 400, Beverly Hills, CA 90211.  That address is used by numerous entities, and other than having the address on its website, there is no evidence of a Medowood PR at that location.  Nor is there any business entity registered in California with "Medowood" in its name.

55.     Vanetik has used an entity named Medowood Management, LLC for Foreign Agent Registration Act filings with the United States Department of Justice. Vanetik identified himself as an officer and vice-president of Medowood Management LLC, which lists its "corporate office" as being in Cheyenne, Wyoming.  The company's Wyoming incorporation documents originally date back to Dec. 10, 2014, when Medowood's principal office was in Suite 609 at an address in California.  The "suite" was actually a mailbox in a UPS store.  Less than a month after its December 2014 incorporation, Medowood changed agents and addresses. In fact, it has changed agents and/or moved offices seven times in just over three years, according to Wyoming records.

COMPLAINT

56.     With one of his FARA filings, Vanetik attached a consulting contract stating that in the opening paragraph that it was between "Meadowood Public Affairs" as the consultant and Rybalka Sergeii as the client.  But in the signature block, the consultant was identified as Medowood Management, LLC, and there appears to be no record of any "Meadowood Public Affairs" in California or elsewhere.

57.     Another month went by with no resolution.  Fuks once again pressed Vanetik on the return of his money and the documentation that supported Vanetik's story.

58.     Vanetik responded on April 8, 2017, and said "I mentioned to you in an earlier text that the PR firm that arranged the consulting services is taking the position that they performed. They sent me the revised schedule which I had forwarded to you weeks before your arrival. The agreement with them has a confidentiality clause, but I can send it redacted based on communication from them. I believe that if I approach them and press for an accommodation in kind (by way of service), they may agree just to salvage good will with me. This may be the best solution. I have a few ideas re all of this. It is up to you, but we should try to talk or meet up in London or europe before I return to US to strategize."

59.     Fuks reminded Vanetik that Vanetik had promised to contact the people who had deceived them and give Fuks a copy of the contract for the tickets.  But another month went by without anything from Vanetik.  Fuks asked again when he was going to get his $200,000 back.

60.     Vanetik responded:  "So now you crossed the line. Get this straight: I do not owe you or Vitaly any money. In fact, you owe us for the meetings in Rome and subsequent work.  My friends and colleagues in Wahington [sic], DC are taking your threats very seriously, and will likely cooperate with our authorities as things progress. This is our last direct communication. If you have anything else to say, direct it to Leonid Wolff [sic]. I understand you have a relationship with him, and he

COMPLAINT

is happy to address whatever claims you purport to have."

61. Vanetik's invocation of Leonid Wulf's name was apparently intended to suggest Vanetik had connections with Russian and Ukrainian mobsters and contract killers so as to intimidate Fuks into backing down. Wulf is a notorious Ukrainian native who emigrated to Israel and became a citizen there and reportedly had ties to Russian and Ukrainian organized crime. In 1998, Ukraine's State Security Service barred Wulf from entering Ukraine, believing him to be a member of a professional organized criminal group suspected of carrying out contract killings in the Odessa, Kyiv, and Dnipropetrovsk region.

62. Vanetik and Fuks subsequently spoke on the phone, and Vanetik again threatened Fuks, telling Fuks that he could have his powerful friends in Washington, DC cancel his United States visa. Soon after this threat from Vanetik, Fuks's visa was canceled and he received a five-year travel ban.

63. Unbeknownst to Fuks at the time of these events, Vanetik has a history of fraudulent conduct.

64. Vanetik and his father, Anatoly Vanetik, were involved with a number of interrelated companies in the business of oil exploration in Russia. Vanetik approached his friend, Elliot Broidy, about investing in one of those companies, Terra Resources (Terra). Broidy agreed to invest $750,000, with the written agreement his investment would go only to efforts to start production on the oil wells. Farmers & Merchants Trust Company (F&M Trust) was the trustee and administrator of the simplified employee pension plan (SEP) for Broidy's individual retirement account (IRA). Broidy invested through F&M Trust, which acquired stock in Terra. Broidy later learned that his investment had not been used in connection with the oil wells, but had instead been used to pay off Vanetik's and his father's preexisting debts.

65. After Vanetik and his father failed to return the money, F&M Trust filed suit in California court against Vanetik and his father for breach of written and

COMPLAINT

oral contracts and for fraud.  A jury found in favor of F&M Trust on all causes of action.

66.    Vanetik sought a new trial.  The trial court rejected that request, noting the Vanetiks' use of a series of shell companies to "insulate themselves."  The trial court further stated that "[Vanetik and his father] were the artful puppeteers who masterminded the scam that relieved the plaintiff of $750,000.  That money was used to personally enrich [Vanetik and his father] and enable them to travel the world trolling for more big fish."

67.    On appeal, the Court of Appeal for the Fourth Appellate District affirmed, finding "substantial evidence supported the jury's verdict against Vanetik and his father on the claims for breach of written contract, breach of oral contract, and fraud."

68.    But in an effort to avoid the punitive damages award against them, Vanetik and his father claimed that they didn't have the money to make good on the civil penalties. Vanetik's lawyers said Vanetik International had $9,600 in its bank account and that Vanetik had just $282 in his own account.  Vanetik's lawyers also disclosed that another Vanetik-linked company, Archer Resources, owed $62,428.74 on a 2008 Bentley that Vanetik drove around California.  Documents introduced during the appeal also showed that the American Express card Vanetik used for the oil venture was also used to purchase a $57,000 watch and pay almost $6,000 to a tailor.  American Express has sued Vanetik for nonpayment of bills totaling more than $181,000.

69.    McClatchy has published several articles concerning Vanetik.

70.    McClatchy concluded that Vanetik had misrepresented his academic history.  As one example, Vanetik boasted that he was "class valedictorian" when he graduated from the University of California, Berkeley, in 1991, and claimed to have "graduated from the Anderson Business School at UCLA where he studied management."  But according to McClatchy, a list provided by Berkeley of winners

of its University Medal for the last 146 years (Berkeley's equivalent of a valedictorian) doesn't include Vanetik's name for 1991 or any other year, and officials for UCLA said there are no enrollment records for Vanetik and that he did not get an MBA degree there.  He did attend an executive program in 1991, which gave a certificate to participants taking one class per week over a period of months.

71.     McClatchy also interviewed Geoffrey Fiala, a director of a company incorporated in 1999 by Vanetik in Nevada called OnePoint, Inc.  Fiala said the company was envisioned as a dating website, with computer programmers based in Russia, and that he and other investors put in money, but the money that went in never resulted in a finished product, and the project fell apart around the time many tech companies cratered in 2000 and 2001. Fiala said:  "My impression of him was he had this aura of wealth and connections in Eastern Europe, and that's why were like, 'he has some connections to power'."  Fiala said about Vanetik: "Everything I was involved in with him went south."  McClatchey stated that another director confirmed Fiala's account but declined comment.

72.     McClatchy also reported on Alon Stivi's business dealings with Vanetik.  Stivi said that he and Vanetik partnered in 2005 on a Vanetik-registered LLC called Fearless Unlimited, Inc., and that Vanetik "did not follow up on his promises of promoting it and funding it. It was never active."  Stivi also said that he armored a high-end Mercedes Benz for Vanetik, only to see it sold to someone else and exported to Russia. According to Stivi, Vanetik never paid him for the work.

73.     It was also reported that Vanetik had donated $1,000 to Gavin Newsom's campaign for Governor of California in June 2018, and that after learning about Vanetik and his conduct, the campaign returned the contribution.

74.     Vanetik also boasts about a private foundation bearing his name that he says he founded "to inspire and create positive change across multiple disciplines." The Facebook page for Vanetik's foundation states that it's a non-profit, but the foundation cannot be found when searching the IRS tax-exempt organization

COMPLAINT

database, ProPublica, GuideStar, Charity Navigator, and Charity 101 Check.

**FIRST CAUSE OF ACTION - PROMISSORY FRAUD**

75.     Plaintiff refers to, and incorporates herein by reference, all preceding paragraphs.

76.     Defendant Vanetik made a promise to Fuks that he would obtain a VIP package to the 2017 U.S. presidential inauguration.

77.     At the time Defendant Vanetik made the promise, he had no intention of performing it.

78.     Defendant Vanetik's promise was made with the intention to induce Fuks to pay Vanetik $200,000.

79.     Fuks relied on Defendant Vanetik's promise, and in reliance on Vanetik's promise, Fuks paid Vanetik $200,000 and incurred several thousands of dollars in expenses to travel to Washington, DC for the inauguration.

80.     Defendant Vanetik failed to perform as promised.

81.     Defendant Vanetik's failure to perform caused Fuks damages in the amount of $200,000 plus several thousands of dollars in expenses to travel to Washington, DC for the inauguration.

82.     Because Vanetik's fraudulent conduct was done in bad faith, Fuks is entitled to an award of punitive damages against Vanetik.

**SECOND CAUSE OF ACTION - INTENTIONAL MISREPRESENTATION**

83.     Plaintiff refers to, and incorporates herein by reference, all preceding paragraphs.

84.     Defendant Vanetik represented to Fuks that he could obtain for Fuks a VIP package for the 2017 U.S. presidential inauguration that included top briefings tickets to inaugural ball, and, most likely, photo opportunities.

85.     Defendant Vanetik's representations concerning the package he could obtain for Fuks were false.

86.     Defendant Vanetik knew that his representations were false at the time

COMPLAINT

he made them.

87.     Defendant Vanetik intended that Fuks would rely on his representations that concerning the VIP inauguration packages and that his representations would induce Fuks to send him $200,000.

88.     Fuks reasonably relied on Defendant's representations and sent Vanetik $200,000 to purchase the VIP inauguration package and to incur travel expenses to visit Washington, DC for the inaugural

89.     Defendant Vanetik's intentional misrepresentations caused Fuks harm in the form of the $200,000 he sent to Vanetik, the expenses he incurred traveling to Washington, DC, and embarrassment.

## THIRD CAUSE OF ACTION - BREACH OF CONTRACT

90.     Plaintiff refers to, and incorporates herein by reference, all preceding paragraphs.

91.     Defendant Vanetik contracted with Fuks to sell him a VIP inaugural package for $200,000.

92.     Pursuant to the contract, Fuks sent Vanetik $200,000 as consideration for the VIP inaugural package.

93.     Defendant Vanetik accepted the $200,000 from Fuks as consideration for the VIP inaugural package, but failed to perform and thus breached the parties' contract when he failed to deliver to Fuks the VIP inaugural package.

94.     Despite failing to deliver, Defendant Vanetik refused to refund the purchase price, and thus Vanetik's breach caused Fuks damages amounting to at least $200,000.

## FOURTH CAUSE OF ACTION - CONVERSION

95.     Plaintiff refers to, and incorporates herein by reference, all preceding paragraphs.

96.     Fuks provided $200,000 of his own money to Vanetik for the purpose of purchasing a VIP inaugural package for Fuks.

COMPLAINT

97.   Vanetik did not purchase the VIP inaugural package for Fuks.

98.   Fuks demanded the return of his $200,000.

99.   Vanetik has refused to return the $200,000 to Fuks, and has thus unlawfully retained the property of Fuks.

## FIFTH CAUSE OF ACTION - UNJUST ENRICHMENT

100.   Plaintiff refers to, and incorporates herein by reference, all preceding paragraphs.

101.   Fuks provided $200,000 of his own money to Defendant Vanetik for the purpose of purchasing a VIP inaugural package for Fuks.

102.   Defendant Vanetik did not purchase the promised VIP inaugural package for Fuks.

103.   Fuks demanded that Defendant Vanetik return his $200,000.

104.   Defendant Vanetik has refused to return the $200,000 to Fuks and has instead retained the $200,000 for his own use and benefit.

105.   Defendant Vanetik's retention of the $200,000 under these circumstances is unjust.

## SIXTH CAUSE OF ACTION - UNLAWFUL, UNFAIR AND DECEPTIVE BUSINESS PRACTICES (Cal. B&P Code Section 17200 et seq.)

106.   Plaintiff refers to, and incorporates herein by this reference, all preceding paragraphs.

107.   Defendant Vanetik has engaged in unlawful business acts and practices. Such acts and practices constitute unfair business practices in violation of California Business and Professions Code section 17200 *et seq.*

108.   In particular, Defendant Vanetik has engaged in unlawful business acts and practices by misrepresenting the character and nature of his business in violation of California Business & Professions Code section 17505, by falsely claiming he had the ability to obtain VIP packages for the 2017 U.S. presidential inauguration.

109.   Defendant Vanetik's misrepresentations about the character and nature

COMPLAINT

1  of his business was intended to induce Fuks into agreeing to send $200,000 to

2  Vanetik in exchange for a VIP package that Vanetik knew he could not and would

3  not deliver.

4        110.   Defendant Vanetik made these misrepresentations and misleading

5  statements directly to Fuks through text messages.

6        111.   As a direct and proximate result of Defendant Vanetik's conduct, Fuks

7  has been harmed.  Among other things, Fuks paid money to Defendant Vanetik for

8  tickets and services that were not delivered.   Accordingly, Fuks is entitled to

9  restitution and other remedies under the UCL statute.

10        112.   Plaintiff Fuks also seeks and is entitled to costs, expenses, and all other

11  remedies permitted by law.

12  **PRAYER**

13        WHEREFORE, Plaintiff prays for judgment as follows:

14      1.     For compensatory damages according to proof;

15      2.     For restitution and any other monetary relief permitted by law;

16      3.     For costs and expenses;

17      4.     For punitive damages, including pursuant to California Civil Code

18           section 3294;

19      5.     For pre-judgment and post-judgment interest, according to law;

20      6.     For reasonable attorney's fees; and

21      7.     For such other and further relief as the Court may deem just and proper.

22  **JURY TRIAL DEMANDED**

23        Plaintiff demands a jury trial on all issues so triable.

24  Dated:  June 18, 2019           DENTONS US LLP

25

26                                By: s/Jae K. Park

27                                  Jae K. Park

28                            Attorneys for Plaintiff Pavel Fuks

COMPLAINT