JOSEPH R. ASHBY (SBN 248579)
joseph@ashbylawfirm.com
ASHBY LAW FIRM P.C.
1055 West Seventh Street, 33rd Floor
Los Angeles, CA 90017
Telephone: (213) 232-3810
Facsimile: (213) 429-0976

WILLIAM T. O'BRIEN (*admitted pro hac vice*)
williamobrien@eversheds-sutherland.us
JOHN W. LOMAS, JR. (*admitted pro hac vice*)
johnlomas@eversheds-sutherland.us
EVERSHEDS SUTHERLAND (US) LLP
700 6th St NW
Washington, DC  20001
Telephone: (202) 220-8049
Facsimile: (202) 637-3593

Attorneys for Plaintiff Pavel Fuks

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAVEL FUKS, an individual,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>YURI VANETIK, an individual,<br><br>　　　　　Defendant. | Case No.: 8:19-cv-1212- FLA (JDEx)<br><br>**PLAINTIFF PAVEL FUKS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| **Fuks** | Plaintiff, Pavel Fuks |
| **Plaintiff** | Plaintiff, Pavel Fuks |
| **Vanetik** | Defendant, Yuri Vanetik |
| **Defendant** | Defendant, Yuri Vanetik |
| **FPTO** | Final Pre-Trial Conference Order, Dkt. #65 |
| **AF** | Admitted Facts, FPTO § 5, Dkt. #65 |
| **Tr. I** | Transcript of the First Day of Trial (Sept. 21, 2021), Dkt. #90 |
| **Tr. II** | Transcript of the Second Day of Trial (Sept. 22, 2021), Dkt. #91 |
| **Tr. III** | Transcript of the Third Day of Trial (Sept. 23, 2021), Dkt. #92 |

# I. PROPOSED FINDINGS OF FACT

## A. Parties and Jurisdiction

1. Plaintiff Pavlo Fuks is a citizen of the foreign state of Ukraine, and resides in Kiev. Tr. I 13:25 – 14:14; FPTO, Parties and Pleadings.

2. Defendant Yuri Vanetik is a citizen of the State of California and a resident of Orange County, California. FPTO § 1 (Parties and Pleadings); AF ¶ 1.

3. The amount in controversy between Fuks and Vanetik in this case is alleged to exceed $75,000, exclusive of interest and costs.

## B. Fuks is Introduced to Vanetik

4. Fuks and Vanetik met each other for the first time in the spring of 2016, when Fuks' close friend Gennady Kernes—then mayor of Kharkiv, Ukraine—introduced Fuks to Vanetik. AF ¶ 3; Tr. I 14:19 – 15:18, 68:3-15; 70:16-23; Tr. II 27:7-29:22.

5. At that time, Vanetik was seeking to be retained by the city of Kharkiv to promote its interests in the United States, and he claimed to be well connected politically in the United States. AF ¶ 3; *see also* Tr. I 15:15-18; 70:16-23.

6. Afterward meeting, Fuks and Vanetik kept in touch and communicated with each other via text message using the WhatsApp Messenger mobile phone application. Tr. I 16:9 – 19:5, 20:12 – 21:19, 23:23 – 29:20, 69:1-9; Ex. 1.

7. Fuks saved the WhatsApp text messages that he and Vanetik exchanged with each other. Tr. I 16:9 – 19:5, 20:12 – 21:19, 23:23 – 29:20; Ex. 1. Using the WhatsApp Messenger export function, Fuks exported all of the WhatsApp messages he and Vanetik exchanged with each other during the period from March 18, 2016 through May 10, 2017 into a data file. *Id*. A print-out of that data file along with an English translation was admitted into evidence as Exhibit 1. *Id*.

C. **Vanetik Promises Fuks VIP Treatment at the 2017 United States Presidential Inauguration in Exchange for $200,000**

8. In the fall of 2016, Fuks and Vanetik exchanged some text messages about the United States presidential election. Tr. I 21:7-19; Ex. 1, p.20.

9. After Donald Trump won the election, Vanetik told Fuks that some of his close friends received major appointments. Ex. 1, p.22; Tr. I 29:2-30:6.

10. Vanetik also professed to be knowledgeable about the inauguration and to have the ability to obtain VIP tickets to the inauguration. Ex. 1, p.22; Tr. I 30:16-31:9. He told Fuks that "There are guests that get tickets and guests that get VIP treatment. Regular attendance is a joke." Ex. 1, p.22. The next day, Vanetik then told Fuks that the "[t]ime to get tickets is next 5 days. Then, they go up. Next year they will be at least 3 times the price – at best." Ex. 1, p.22; Tr. I 31:3-22.

11. Fuks told Vanetik he wanted to buy the very best and asked Vanetik how much the tickets would cost. Ex. 1, p.22; Tr. I 32:17-23. Vanetik continued to hold himself out as being knowledgeable about inauguration events and access. He told Fuks he would verify costs and explain several options. Ex. 1, p.22. Then, the next day, Vanetik messaged Fuks and said "Best VIP 100k per person. 3 days includes top briefings tickets to inaugural ball, etc. photo opps most likely. There are levels below that as well." Ex. 1, p.22; Tr. I 32:24 - 33:1. Vanetik further noted that "Hotels should be booked now and payments handled as soon as possible." *Id*.

12. Relying on what Vanetik had been telling him, Fuks said that he would take two of the best VIP package tickets. Tr. I 33:4-6.

13. On November 18, 2016, Vanetik responded to Fuks: "Passports email to me. Will send you wire information later today," and gave his email address—Yuri@vanetik.com—to Fuks. Ex. 1, p.22; Tr. I p. 33:8-11.

14. Vanetik initially instructed Fuks to wire payment to a Citibank account for his attorney's client trust account—"Hamilton Law Offices Client

Trust Account.". Ex. 1, p.22; Tr. I 33:12 – 34:8. Vanetik also instructed Fuks to note that the wire was for "legal services." *Id*.

15. But a few hours later, Vanetik then sent a copy of an invoice from Odyssey Management LLC, and asked Fuks to pay in accordance with that invoice instead. Ex. 1, p.23; Tr. I 34:9 – 36:19; Ex. 2. Relying on Vanetik's professed knowledge and ability to deliver two VIP inauguration packages, Fuks had $200,000 wired from an account for his company BEM Global to Odyssey Management LLC in California per Vanetik's instructions. Tr. I 36:20 – 38:9; Ex. 2; Ex. 3.

16. On November 24, 2016, Fuks asked Vanetik when he would be sending the program of events for the package he had purchased. Ex. 1, p.23; Tr. I 38:12 – 39:21. Vanetik responded within minutes and stated "Should have some type of schedule next week." Ex. 1, p.23. A few days later, on November 29, 2016, Vanetik messaged Fuks and said: "Hi Pavel. Everything is done. I now have what seems to be the final layout. There are a few 'nuances' to go over." Ex. 1, p.23; Tr. I 38:22 – 39:6.

17. The next day, Vanetik sent Fuks the following details regarding the "VIP package that we bought" using the $200,000 that Fuks had sent to Vanetik:

    Cabinet Dinner – 2 tickets
    Victory Reception – 4 tickets
    Inaugural Concert and Fireworks – 4 tickets
    Parade – 4 VIP Tickets
    Inaugural Ball Premier Access – 2 tickets
    Presidential Swearing-In Ceremony – 2 tickets

Ex. 1, p.23; Tr. I 39:7-16.

18. Fuks asked Vanetik to confirm that all of the tickets Vanetik had listed in his message were in fact the tickets that Fuks had purchased. Vanetik confirmed that they were. Ex. 1, p.23; Tr. I 39:7-16. When Fuks shared that he had heard

they were getting bad seats, Vanetik scoffed and told Fuks that he was getting a $250,000 package despite only paying $200,000, with extras including certain congressional events and placement during events. Ex. 1, p.24.

19. Later, Vanetik told Fuks that if he wanted to have a better chance to meet president-elect Trump, Fuks would need to pay an additional $350,000. Ex. 1, p.25; Tr. I 39:25 – 40:4.

20. Less than two weeks before the inauguration, Vanetik sent Fuks a message regarding the payment Fuks had made for the inauguration package from an account of his company BEM Global, stating: "Pavel - next several days need to have BEM Global sign a note for funds transferred. Otherwise, you will need to send 80k to covet [sic] taxes. This is a priority. This saves you 80k and 50k from the package you are getting." Ex. 1, p.26.

**D.  Vanetik Fails to Deliver the VIP Inauguration Package He Had Promised Fuks and for which Fuks had paid $200,000.**

21. Just a few days before the inauguration, Vanetik told Fuks that there were numerous changes to the program and huge amounts of money coming in for the events, but did not explain. Ex. 1, p.26.

22. On January 15, 2017, Vanetik messaged Fuks and said "Hi pavel. I should have final schedule sent to me today. Will forward it to you. I will be leaving for DC tomorrow." Ex. 1, p.27.

23. Two days later, when Vanetik still hadn't sent the schedule, Fuks asked where it was. Vanetik responded: "Hey Pavel. I just arrived to DC. I am waiting for a revised one. There is a problem with dinner. Trying to fix it... should have it in am. What time are you flying in?" Ex. 1, p.27; *see also* Tr. I 40:8 - 41:2. After finding out when Fuks was arriving in Washington, DC, Vanetik said "I will send you schedule in about an hour or so. We got f***ed on the dinner. I am working on fixing it. I hate this Inauguration. It is nothing but headaches. It would be better if you came tomorrow or today." *Id*.

24. Fuks arrived in Washington the day before the inauguration. Tr. I 40:17 - 41:20. But Vanetik failed to deliver the VIP tickets to that evening's events—the Inaugural Concert and Fireworks and Presidential Inaugural Ball—that Fuks had purchased from Vanetik. Tr. I 42:4-15, 43:6 – 44:6. Instead, Vanetik gave Fuks three non-VIP tickets to something hosted by the Texas State Society and called "Black Tie & Boots" that Vanetik had just bought a week earlier for $2,500 each. Exs. 5, 6; Tr. I 44:7-19; *see also* Ex. 1, p.27.

25. Vanetik had promised to have a driver pick up Fuks and his party the next morning to take them to the inauguration. Tr. I 44:7-19. But the car never came. Tr. I 45:11-12. So Fuks and his party started out walking in the rain to try to see the inauguration. Tr. I 45:13 - 46:8. But the streets were very crowded, and when they finally approached an access point, they were not allowed to come through because Vanetik had never given them any passes. Tr. I 45:13 - 46:8. Fuks and his party ended up returning to their hotel where they watched the inauguration ceremony on television at the hotel bar. Tr. I 46:9-20; *see also* Exhibit 1, p.27.

26. Vanetik also failed to provide Fuks with any tickets to that evening's inaugural ball. Tr. I 47:14-21. Fuks ended up receiving none of the VIP tickets that Vanetik had promised him and for which Fuks paid Vanetik $200,000. Tr. I 43:6 – 44:8, 48:15 - 49:3,

27. Fuks sent Vanetik a picture of some friends of his who had attended balls that Fuks had understood would be part of the VIP treatment, and said: "These are my friends, they attended a real ball yesterday and we did some f**king s**t for suckers." Ex. 1, p.28; Tr. III 22:10 - 23:6.

28. Fuks also asked Vanetik to let him know when would be a convenient time to discuss a refund. Ex. 1, p.28; Tr. I 49:23-25. Vanetik promised he would return the funds. Tr. I 50:1-2. He never did. Tr. I 53:3-4.

29. Vanetik tried to pin the blame on others and claimed he was cheated, and said he would straighten things out with them. Tr. I 49:4-15 – 50:3. Fuks asked

1  Vanetik to work with Fuks's lawyers to recover the money, and also asked him
2  identify who had cheated him and provide copies of all documentation such as
3  receipts showing payments for event tickets. Tr. I 49:4 - 53:24; Tr. II 14:19 – 15:3;
4  *see also* Ex. 1, p.28-29. Vanetik kept dodging Fuks, and never refunded Fuks'
5  money and never provided Fuks or his attorneys with any of the requested
6  documentation. *Id*.

7     30.   On March 8, 2017, Fuks again requested an update from Vanetik.
8  Vanetik responded the next day stating: "Hi Pavel. Hope you are well. I had
9  forwarded a letter from (I assume your in house lawyer) to the principals. They
10 should be responding shortly. The company that invoiced your firm is subject to an
11 NDA, which prevents us from disclosing the actual agreements with third parties.
12 The position of the PR firm (Meadowood PR) is that it fulfilled its obligations to
13 me (and you)." Ex. 1, p.28-29; Tr. I 51:3-24. Vanetik never provided a copy of the
14 NDA to Fuks. Tr. I 53:20-24.

15    31.   Another month went by with no resolution. Fuks once again pressed
16 Vanetik on the return of his money and the documentation that supported
17 Vanetik's story. Ex. 1, p.29. But Vanetik never refunded Fuks his money, never
18 provided Fuks with any of the requested, and ultimately stopped responding to
19 Fuks. Tr. 53:3 – 55:13; Ex. 1, p.29.

20 **E.    Vanetik's Prior Fraudulent Conduct**

21    32.   This is not the first time that Vanetik has engaged in fraudulent
22 conduct. Vanetik and his father, Anatoly Vanetik, were involved with a number of
23 interrelated companies in the business of oil exploration in Russia. Ex. 21 at PF-
24 000105; *see also* Tr. II 125:12 – 126:3.

25    33.   Vanetik approached his friend, Elliot Broidy, about investing in one of
26 those companies. *Id*. Broidy agreed to invest $750,000, with the written agreement
27 his investment would go only to efforts to start production on the oil wells. *Id*.
28 Broidy later learned that his investment had not been used in connection with the

oil wells, but had instead been used to pay off Vanetik's and his father's preexisting debts. *Id*.

34. After Vanetik and his father failed to return the money, they were sued for fraud and breach of contract. Ex. 21 at PF-000105. A jury found against Vanetik and his father as to all of the causes of action against them. Ex. 21 at PF-000105; *see also* Tr. II 125:12 – 126:3. Regarding the fraud claims, the jury found: (1) the Vanetiks made a false representation to Broidy; (2) the Vanetiks knew the representation was false, or made the representation recklessly and without regard for its truth; (3) the Vanetiks intended that Broidy and F&M Trust (the trustee of the simplified employee pension plan for Broidy's individual retirement account) rely on the representation; (4) Broidy and F&M Trust reasonably relied on the representation; and (5) their reliance on the representation was a substantial factor in causing harm to Broidy and F&M Trust. Ex. 21 at PF-000109-111.

35. Vanetik sought a new trial. The trial court rejected that request, noting the Vanetiks' use of a series of shell companies to "insulate themselves." The trial court further stated that "[Vanetik and his father] were the artful puppeteers who masterminded the scam that relieved the plaintiff of $750,000. That money was used to personally enrich [Vanetik and his father] and enable them to travel the world trolling for more big fish. Not a spoonful of dirt was turned in any Russian oil fields. As near the court can recall, there was no testimony that either of these defendants ever even visited the oil fields with any of the plaintiff's money in their pockets. The jury had little trouble concluding that the Vanetiks should be personally liable for the misdeeds committed behind the screen of some corporate name." Ex. 21 at PF-000118.

36. On appeal, the Court of Appeal for the Fourth Appellate District affirmed, finding "substantial evidence supported the jury's verdict against Vanetik and his father on the claims for breach of written contract, breach of oral contract, and fraud." Ex. 21 at PF-000106.

# CONCLUSIONS OF LAW

## A. Jurisdiction and Venue

1. The court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(b) as the plaintiff is a citizen of a foreign state (Ukraine), the defendant is a citizen of a State (California), and the amount in controversy between the parties exceeds $75,000 exclusive of costs.

2. Venue is proper in this District and this Division pursuant to 28 U.S.C. § 1391(b)(1) as the defendant resides in this District.

3. The court has personal jurisdiction over Vanetik as he is a citizen of the State of California and resides in Orange County, California.

## B. Count One – Promissory Fraud

4. "Under Civil Code section 1709, one is liable for fraudulent deceit if he 'deceives another with intent to induce him to alter his position to his injury or risk . . . .' Section 1710 of the Civil Code defines deceit for the purposes of Civil Code section 1709 as, inter alia, '[a] promise, made without any intention of performing it.' ' "The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, o nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage."[Citations.]' Each element must be alleged with particularity." *Beckwith v. Dahl*, 205 Cal.App.4th 1039, 1059-1060, 141 Cal.Rptr.3d 142 (2012), internal citations omitted.

5. "An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a [written] contract. [Citations.] In such cases, the plaintiff's claim does not depend upon whether the defendant's promise is ultimately enforceable as a contract." *Austin v. Medicis*, 21 Cal. App. 5th 577, 588, 230 Cal.Rptr.3d 528 (2018).

6. Vanetik promised Fuks that he would obtain for him a VIP ticket package for the 2017 U.S. presidential inauguration. At the time Vanetik made the promise, he had no intention of performing it.

7. Vanetik made the promise with the intention to induce Fuks to pay Vanetik the sum of $200,000.

8. Fuks relied on Vanetik's promise and accordingly paid to Vanetik the sum of $200,000.

9. Vanetik failed to perform as promised. Instead of delivering any of the promised VIP event tickets, Vanetik provided Fuks with three non-VIP tickets to a Texas State Society event for which Vanetik paid just $7,500.

10. Vanetik's failure to perform caused Fuks damages in the amount of the $200,000 that Fuks had sent to Vanetik for VIP inauguration event tickets that he never received.

11. Accordingly, Defendant Vanetik is liable to Fuks for promissory fraud and, and Fuks is entitled to $200,000 in damages from Vanetik.

**C.    Count Two – Intentional Misrepresentation**

12. The elements of a claim for intentional misrepresentation are (1) a knowingly false representation by the defendant; (2) an intent to deceive or induce reliance; (3) justifiable reliance by the plaintiff; and (4) resulting damages." *Service by Medallion, Inc. v. Clorox Co.*, 44 Cal.App.4th 1807, 1816, 52 Cal.Rptr.2d650, (1996) [combining misrepresentation and scienter as a single element].

13. Here, Vanetik falsely represented to Fuks that Fuks could buy the "Best VIP" tickets to 2017 presidential inauguration events for $100,000 per person. Vanetik knew that Fuks, as a foreign national, could not buy tickets to the top inauguration events.

14. Vanetik made this statement to induce Fuks to send at least $200,000 to Vanetik, and Fuks is entitled to $200,000 in damages from Vanetik.

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

15. Fuks relied on Vanetik's false representations and sent Vanetik $200,000 to an account specified by Vanetik, believing that Vanetik would provide him with the best VIP ticket package for U.S. presidential inauguration events.

16. Fuks justifiably relied on the false representations made by Vanetik, an American claiming to be politically connected, including by having "close friends" who received major appointments in the Trump administration.

17. Fuks' justifiable reliance on Vanetik's false representations caused Fuks damages in the amount of the $200,000 he sent to Vanetik for the VIP inauguration event tickets that he never received.

18. Accordingly, Defendant Vanetik is liable to Fuks for intentional misrepresentation, and Fuks is entitled to $200,000 in damages from Vanetik.

**D.   Count Three – Breach of Contract**

19. "To prevail on a cause of action for breach of contract, the plaintiff must prove (1) the contract, (2) the plaintiff's performance of the contract or excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damage to the plaintiff." *Richman v. Hartley*, 224 Cal.App.4th 1182, 1186, 169 Cal. Rptr.3d 475 (2014).

20. As evidenced by a series of text messages exchanged between Fuks and Vanetik, the two entered into a written agreement through which Vanetik would provide Fuks with a pair of VIP treatment packages for the 2017 United States presidential inauguration in exchange for Fuks paying Vanetik $200,000.

21. Fuks performed his obligation under the contract by having a $200,000 payment wired to a bank account to which Vanetik had instructed Fuks to send the payment.

22. Vanetik breached the parties' agreement by not providing the VIP inauguration event ticket package.

23. Vanetik's breach caused Fuks damages in the amount of the $200,000 he paid to Vanetik for the VIP inauguration package.

24. Accordingly, Defendant Vanetik is liable to Fuks for breach of contract, and Fuks is entitled to $200,000 in damages from Vanetik.

**E.     Count Four – Conversion**

25. "[A]ny act of dominion wrongfully exerted over the personal property of another inconsistent with the owner's rights thereto constitutes conversion." *Plummer v.Day/Eisenberg, LLP*, 184 Cal.App.4th 38, 50, 108 Cal.Rptr.3d 455, (2010).

26. "If a defendant is authorized to make a specific use of a plaintiff's property, use in excess of that authorized may subject the defendant to liability for conversion, if such use seriously violates another's right to control the use of the property." *Duke v.Superior Court,* 18 Cal.App.5th 490, 506, 226 Cal.Rptr.3d 807 (2017). Further, "[a] conversion can occur when a willful failure to return property deprives the owner of possession." *Fearon v. Department of Corrections,* 162 Cal. App.3d 1254, 1257, 209 Cal. Rptr. 309 (1984), internal citation omitted.

27. Money can be the subject of a cause of action for conversion when "there is a specific, identifiable sum involved, such as where an agent accepts a sum of money to be paid to another and fails to make the payment.'" *PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 150 Cal.App.4th 384, 395, 58 Cal.Rptr.3d 516 (2007), internal citations omitted.

28. Here, Fuks sent to Vanetik the specific sum of $200,000 so that Vanetik could obtain for Fuks a pair of VIP Treatment packages from the 2017 U.S. Presidential Inauguration. By not providing Fuks the VIP treatment package, Vanetik failed to use the $200,000 as authorized. Further, when Fuks did not receive the VIP treatment package and demanded the return of his $200,000, Vanetik willfully chose not to return the $200,000.

29. Accordingly, Defendant Vanetik is liable to Fuks for conversion of Fuks' $200,000, and Fuks is entitled to $200,000 in damages from Vanetik.

### F. Count Five – Unjust Enrichment

30. In California, an unjust enrichment claim is a "quasi-contract claim for relief that seeks restitution based on the defendant's unjust enrichment." *Jordan v. Wonderful Citrus Packing LLC*, Case No. 1:18-CV-00401-AWI-SAB (E.D. Cal. Sep. 10, 2018) (citing *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015)).

31. "The purpose of a quasi-contract claim is to 'restore the aggrieved party to his former position by return of the thing or its equivalent in money.'" *Id.* (quoting *McBride v. Boughton*, 123 Cal. App. 4th 379, 388 n.6 (2004)).

32. "At the heart of a quasi-contract claim is an implied legal obligation imposed by equity on the defendant to provide restitution to the aggrieved party to remedy the unjust enrichment." *Id.* (internal citations omitted). "The bases for a quasi-contract claim may be unjust enrichment that is caused by conversion, coercion, fraud, or mistake." *Id.* (internal citations omitted).

33. Here, Vanetik was unjustly enriched through fraud or conversion because he (1) induced Fuks to send him $200,000 to be used for the purchase of two VIP inauguration package for Fuks, (2) accepted the $200,000, but never actually purchased for and provided to Fuks the VIP inauguration event tickets, and (3) refused to return the $200,000.

34. Accordingly, Vanetik is liable to Fuks for restitution in the amount of $200,000, plus interest.

### G. Interest

35. Under California Civil Code § 3287(b): "Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix…" Interest is recoverable from time of the breach when the amount of money due is liquidated or from time it becomes liquidated. *Moreno v. Jessup Buena Vista Dairy,* 50 Cal.

App. 3d 438, 123 Cal. Rptr. 393 (1975). Prejudgment interest must be awarded upon request from the first day there exists both breach of contract and a liquidated claim. *North Oakland Medical Clinic v. Rogers*, 65 Cal.App.4th 824 [76 Cal.Rptr.2d 743 (1998).

36. Under California Civil Code § 3289(a) "Any legal rate of interest stipulated by a contract remains chargeable after a breach thereof…until the contract is superseded by a verdict or other new obligation." However, "[i]f a contract does not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10 percent per annum after breach." California Civil Code § 3289(b).

37. Prejudgment interest is also recoverable on tort damages under California Civil Code § 3287(a). Where interest is awarded on tort and other non-contractual claims, the rate is 7% per annum from the time the claim accrues. *See* Cal Const, Art. XV, § 1; *Children's Hospital & Medical Center v. Bontá*, 97 Cal.App.4th 740, 775, 118 Cal.Rptr.2d 629 (2002).

38. Accordingly, Fuks is entitled to pre-judgment interest on the $200,000 in damages for which Vanetik is liable, at a rate of at least 7% per annum and beginning no later than January 20, 2017 and through to the date of judgment.

**H.   Post-Judgment Interest**

39. Pursuant to Section 685.010(a) of the California Code of Civil Procedure, interest accrues at the rate of 10% per annum on the principal amount of a money judgment remaining unsatisfied.

40. Accordingly, Fuks is entitled to post-judgment interest at the rate of 10% per annum on the judgment, beginning as of the date of judgment.

DATED: November 19, 2021

ASHBY LAW FIRM P.C.

Joseph R. Ashby

EVERSHEDS SUTHERLAND LLP
William T. O'Brien
John W. Lomas, Jr.

By: ___/s/ *Joseph R. Ashby*___
      Joseph R. Ashby
Attorneys for Plaintiff Pavel Fuks